z4 TECHNOLOGIES, INC., Plaintiff

v.

MICROSOFT CORPORATION, and
Autodesk, Inc., Defendants.

No. 6:06–CV–142.

United States District Court,
E.D. Texas,
Tyler Division.

June 14, 2006.

438

Elton Joe Kendall, Provost Umphrey, Dallas, TX, Thomas John Ward, Jr., Law Office of T. John Ward Jr., PC, Longview, TX, Ernie L. Brooks, Frank A. Angileri, John S. Leroy, John E. Nemazi, Robert

C.J. Tuttle, Thomas A. Lewry, Brooks & Kushman PC, Southfield, MI, for Plaintiff.

Isabella Fu, Katherine Ford Horvath, Microsoft Corporation, Redmond, WA, John Marcus Bustamante, Fish & Richardson, Austin, TX, John A. Dragseth, Fish & Richardson, Minneapolis, MN, John E. Gartman, Matthew C. Bernstein, Seth M. Sproul, Fish & Richardson, San Diego, CA, Jennifer Parker Ainsworth, Wilson, Sheehy, Knowles, Robertson & Cornelius PC, Allen Franklin Gardner, Michael Edwin Jones, Cindy Marie Allen, Potter Minton PC, Tyler, TX, for Defendants.

## MEMORANDUM OPINION AND ORDER

DAVIS, District Judge.

Before the Court is Plaintiff z4 Technologies, Inc.'s ("z4") Motion and Brief for Entry of Permanent Injunction (Docket No. 333). For the reasons discussed below, z4's motion is **DENIED**.

## BACKGROUND

z4 brought suit against Microsoft Corporation ("Microsoft") and Autodesk ("Autodesk"), Inc. alleging infringement of U.S. Patent Nos. 6,044,471 ("the '471 patent") and 6,785,825 ("the '825 patent"). The patents disclose methods for limiting the unauthorized use of computer software, referred to as product activation. The case was tried to a jury on April 10 through April 19, 2006. At trial, z4 asserted one claim of the '471 patent and two claims of the '825 patent. The jury found that Microsoft and Autodesk infringed all three claims and that Microsoft's infringement was willful. The jury also found that neither Microsoft nor Autodesk proved by clear and convincing evidence that any of the listed claims of the patents in the lawsuit were invalid. The jury awarded

$115 million in damages against Microsoft and $18 million against Autodesk.

Specifically, the jury found that Microsoft's Office and Windows software products infringed the asserted claims of the two patents-in-suit. z4 asks the Court to enjoin Microsoft from making, using, selling, offering for sale, and/or importing its current software products that use product activation, *i.e.* Windows XP products since 2001 and Office products since 2000. z4's motion proposes that the Court order Microsoft to deactivate the servers that control product activation for Microsoft's infringing products and to re-design its Windows and Office software products to eliminate the infringing technology. Microsoft will release the next generation of its Windows and Office software—Windows Vista (2007) and Office (2007)—in January of 2007, and both products plan to eliminate the infringing product activation technology.

## APPLICABLE LAW

When considering whether to award permanent injunctive relief to a prevailing plaintiff in a patent infringement dispute, courts should apply the traditional four-factor test used by courts of equity. *See eBay, Inc. v. MercExchange, LLC,* —— U.S. ——, ——, 126 S.Ct. 1837, 1839, 164 L.Ed.2d 641 (2006). The prevailing plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* The Court held "the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards." *Id.* at 1841.

## ANALYSIS

### *Irreparable Harm Suffered by z4*

z4 contends that a finding of infringement and validity raises a rebuttable presumption of irreparable harm. z4 argues this presumption applies to the irreparable harm element of the test laid out by the Supreme Court in *eBay* for two reasons. First, z4 argues that the presumption arises because the Supreme Court cited *Amoco Production Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) in its *eBay* decision. z4 suggests that the Supreme Court's citing of *Amoco Production* is significant because in that case the Supreme Court indicated that the standard for a preliminary injunction is essentially the same as that for a permanent injunction. z4 then concludes that because the Federal Circuit has held that a strong showing of infringement and validity raises a presumption of irreparable harm in the context of a preliminary injunction, such a presumption must apply to permanent injunctions.

Next, z4 contends that the Supreme Court's comparison of patent injunctions to copyright injunctions in the *eBay* decision supports the application of a presumption of irreparable harm. z4 first concludes that the Federal Circuit derived its presumption of irreparable harm in preliminary injunction cases from the copyright law based on language from a footnote in *Smith International Inc. v. Hughes Tool Co.,* that states, "this is the rule in copyright cases." *See* 718 F.2d 1573, 1581 n. 7 (Fed.Cir.1983). z4 then contends that this mention of copyright law by the Federal Circuit leads to the application of a rebuttable presumption with regard to permanent injunctions because the Supreme

Court draws a parallel between the copyright act and the patent act in *eBay*.

z4's arguments for the application of a presumption of irreparable harm are creative, but z4 cannot cite to any Supreme Court or Federal Circuit case that requires the application of a rebuttable presumption of irreparable harm with regard to a permanent injunction. In *Amoco Production*, the Supreme Court stated that applying a presumption of irreparable harm in the context of an injunction "is contrary to traditional equitable principles." *See Amoco Prod. Co.*, 480 U.S. at 545, 107 S.Ct. 1396. Furthermore, in *eBay*, the Supreme Court indicated that an injunction may only issue "in accordance with the principles of equity" under both the patent and the copyright acts but does not in any way imply that a rebuttable presumption of irreparable harm should apply to permanent injunctions under either act. *See eBay*, 126 S.Ct. at 1840. Rather, the Supreme Court stated, "[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury. . . ." *Id.* at 1839. This language does not imply a presumption, but places the burden of proving irreparable injury on the plaintiff. Moreover, in *eBay*, the Supreme Court warned against the application of categorical rules when applying the traditional principles of equity. *See id.* at 1840–41. z4's suggestion, that the right to exclude creates a presumption of irreparable harm, is not in line with the Supreme Court's holding, which mandates that courts balance the traditional principles of equity when considering the remedy of a permanent injunction in patent cases. Accordingly, the Court does not apply a presumption of irreparable harm.

■ z4 argues that it will suffer irreparable harm if Microsoft is not enjoined from infringing the patents-in-suit. z4 contends that it made tremendous efforts to commercialize its invention prior to the suit and that its failure to succeed was partly due to Microsoft's infringement. z4 implies that it was, and will continue to be, irreparably harmed by Microsoft's infringement because there is no way to calculate the economic success z4 might have enjoyed but for Microsoft's infringement.

There is no logical reason that a potential consumer or licensee of z4's technology would have been dissuaded from purchasing or licensing z4's product activation technology for use in its own software due to Microsoft's infringement. Similarly, Microsoft's continued infringement does not inhibit z4's ability to market, sell, or license its patented technology to other entities in the market. Microsoft does not produce product activation software that it then individually sells, distributes, or licenses to other software manufacturers or consumers. If it did, then z4 might suffer irreparable harm in that Microsoft would be excluding z4 from selling or licensing its technology to those software manufacturers or consumers. However, Microsoft only uses the infringing technology as a small component of its own software, and it is not likely that any consumer of Microsoft's Windows or Office software purchases these products for their product activation functionality.

In the absence of a permanent injunction against Microsoft, z4 will not suffer lost profits, the loss of brand name recognition or the loss of market share because of Microsoft's continued sale of the infringing products. These are the type of injuries that are often incalculable and irreparable. The only entity z4 is possibly prevented from marketing, selling or licensing its technology to absent an injunction is Microsoft. As discussed in the next

section, z4 can be compensated for any harm it suffers in the way of future infringement at the hands of Microsoft by calculating a reasonable royalty for Microsoft's continued use of the product activation technology. Accordingly, z4 has not demonstrated that it will suffer irreparable harm absent a permanent injunction.

*Adequacy of Remedies Available at Law*

 z4 argues that monetary damages for future infringement are not an adequate remedy because they cannot compensate z4 for the loss of its right to exclude Microsoft from making, using, offering for sale, or selling its invention in the absence of an injunction. z4's argument implies that a violation of the right to exclude under the patent act can never be remedied through money and that because any future infringement by Microsoft would violate z4's right to exclude such a violation could also not be remedied through monetary damages. However, in *eBay*, the Supreme Court indicated that the right to exclude alone is not sufficient to support a finding of injunctive relief and that such relief " 'may' issue only 'in accordance with the principles of equity' " under § 283 of the patent act. *See eBay*, 126 S.Ct. at 1840. Accordingly, a violation of the right to exclude does not inevitably lead to the conclusion that a patent holder cannot be adequately compensated by remedies at law such as monetary damages without first applying the principles of equity.

The violation of a patent owner's right to exclude can present a situation where monetary damages cannot adequately compensate the patent holder for that injury. For example, when an infringer saturates the market for a patented invention with an infringing product or damages the patent holder's good will or brand name recognition by selling infringing products that infringer violates the patent holder's exclusionary right in a manner that cannot be compensated through monetary damages. This is because it is impossible to determine the portions of the market the patent owner would have secured but for the infringer or how much damage was done to the patent owner's brand recognition or good will due to the infringement. However, this is not the scenario in the present case. Microsoft's use of z4's intellectual property does not exclude z4 from selling or licensing its product to any sector of the market or threaten z4's brand name recognition or good will in any way. z4 is only excluded from selling or licensing its technology to Microsoft. Accordingly, z4 is not excluded from the use of its intellectual property in a way that cannot be calculated with reasonable certainty in the form of monetary damages, just as the past damages for infringement were calculated at trial.

In his concurrence, Justice Kennedy instructed courts to be cognizant of the nature of the patent being enforced and the economic function of the patent holder when applying the equitable factors. *Id.* at 1842 (Kennedy, J., concurring). Justice Kennedy specifically mentioned the situation where a "patented invention is but a small component of the product the companies seek to produce" and states that in such a situation, "legal damages may well be sufficient to compensate for the infringement and an injunction may not serve the public interest." *Id.* (Kennedy, J., concurring). Here, product activation is a very small component of the Microsoft Windows and Office software products that the jury found to infringe z4's patents. The infringing product activation component of the software is in no way related to the core functionality for which the software is purchased by consumers. Accordingly, Justice Kennedy's comments support the conclusion that monetary damages would be sufficient to compensate z4 for any future infringement by Microsoft.

Microsoft indicated that it is phasing out all infringing products beginning with the release of its 2007 versions of Windows and Office in January of 2007. Microsoft calculates that it will then require two to three years after the release of these new products for all infringing products to be phased out of its product line.[1] Calculating the appropriate royalty rate for any future infringement based on the sale of the older Microsoft products should not be too indefinite or difficult. Such future damages will not be based on injuries that are difficult to measure such as the loss of market share or damage to brand name recognition and good will, but will be based on a reasonable royalty for each of the infringing products sold by Microsoft. This calculation can be made based on the same reasonable royalty calculation used by the jury at trial and by referring to Microsoft's internal records showing the number of sales for the infringing copies of software during the time period. Furthermore, it is not a legitimate concern that Microsoft would be unable to pay damages incurred by z4 through any future infringement.

For the reasons stated above, z4 has not demonstrated that monetary damages are insufficient to compensate it for any future infringement by Microsoft.

*The Balance of Hardships*

■ z4's proposed permanent injunction includes two components. The first component involves enjoining Microsoft from making or selling its Windows and Office software products, after a reasonable time has been provided to allow Microsoft to redesign the products without the infringing product activation technology. The second component involves Microsoft immediately "turning off" or deactivating its current product activation servers and leaving them "off" until such time as Microsoft can restart them without infringing the patents-in-suit. The Court will consider the hardships related to these two components in turn.

Microsoft argues that the resources, time, and expense required to redesign its Windows and Office software products would create a significant hardship on Microsoft. Redesigning Microsoft Windows and Office software products, even to remove a small component such as product activation, is undoubtably an enormous task. Microsoft argues that such an undertaking would require enormous resources and expense. Microsoft submitted the declarations of Alexandra B. Rector, a Business Manager of Microsoft Office Sustaining Engineering, and Laura Joseph, a Program Manager on the Windows Release Management Team, as evidence of the hardship Microsoft would suffer if a permanent injunction requiring a redesign of the Office and Windows software products were granted. The declarations indicate that Microsoft would have to re-release its current versions of Office, with 450 separate variations in thirty-seven different languages, and Windows, with 600 separate variations in over forty languages. Microsoft contends that both products would have to be re-engineered, tested, repackaged, and then placed into the appropriate distribution channels. According to Microsoft, such an undertaking would require excessive resources and be exceedingly expensive. Furthermore, Microsoft claims that the scheduled release of its 2007 Windows and Office products would likely be delayed if resources were

---

1. Microsoft informed the Court that although it is releasing new non-infringing versions of its Windows and Office software in January 2007, the older infringing versions will not be completely phased out of the market for several years because many older computer systems in the marketplace will not be able to support the newer products for that period of time.

pulled from its development team to work on the re-release of the previous infringing Office and Windows products.

Similarly, Microsoft argues that the repercussions of "turning off" its product activation system are incalculable, particularly in the likely event that the public became aware of the fact that the activation servers were deactivated. Microsoft argues that in such an event the market would be flooded with pirated software resulting in incalculable losses. Microsoft contends that without the deactivation servers it has no way of deactivating software that has been pirated and installed on multiple computers. Furthermore, Microsoft contends that when the product activation servers are "restarted" it would have no way of determining which copies of the programs installed over that period of time were legitimate legal copies of the product and which were illegal pirated versions. Microsoft claims this would inhibit it from servicing the legitimate copies with product updates and patches.

z4 argues that it will suffer hardship because Microsoft will be using its intellectual property. As discussed above, Microsoft's use of z4's intellectual property is not to the exclusion of z4 in any major sense and, to the extent it is, can be remedied in the form of monetary damages. z4 argues that Microsoft is merely presenting an unlikely and purely hypothetical chain of events that would not in fact occur if its proposed injunction were granted. Although the arguments presented by Microsoft may be hypothetical, the scenarios Microsoft describes are not out of the realm of possibility and are in some instances quite likely. Importantly, the potential hardships Microsoft could suffer if the injunction were granted outweigh any limited and reparable hardships that z4 would suffer in the absence of an injunction.

*The Public Interest*

■ Microsoft's Windows and Office software products are likely the most popular software products in the world. The vast majority of computers sold, whether to individuals, businesses, governments, or educational institutions, run on the Microsoft Windows operating system and employ the Microsoft Office suite of software.

Microsoft argues that the redesign of its Windows and Office products would undoubtedly effect certain sectors of the public. Microsoft suggests that smaller computer manufacturers (called system builders), retail sellers, and the consumers of both would be effected if z4's proposed injunction were granted.

Microsoft contends that the system builders would be harmed because of the time, testing, and expense required for these manufacturers to integrate a new release or re-release of Windows and Office products to be used with their computer systems. Although it is likely that changes to Windows or Office would not be significant enough to have as dramatic of an effect on the system builders as Microsoft proposes, such a re-release of the Microsoft products would likely create a burden for these manufacturers.

Furthermore, Microsoft contends that a redesign of its products could result in the products being taken off the market for a short period of time. Microsoft urges that such an absence from the market, even if for only a week, would have a detrimental effect on the retail sellers of its products as well as the retail consumers.

It is impossible to determine the actual effect that the implementation of such a re-design might have on the availability of Microsoft's products and the accessibility of those products to the public. However, it is likely that any minor disruption to the distribution of the products in question

could occur and would have an effect on the public due to the public's undisputed and enormous reliance on these products.

Microsoft also proposes a host of repercussions to the public resulting from the deactivation of the activation servers. Microsoft contends that, in the event the servers were deactivated, the market would be flooded with illegal, pirated copies of Windows and Office software, leaving unsuspecting customers with no way of determining the genuineness of their software. Microsoft argues that these unsuspecting purchasers of pirated software would be very susceptible to contracting computer viruses and other security breaches to their computer systems by installing pirated software. Furthermore, Microsoft contends that because it would be impossible for Microsoft to determine genuine versions from pirated versions once the system was reactivated, some legitimate users of Microsoft software might be unable to download product patches and updates.

Again, although it is impossible to determine the actual events that would follow the deactivation of Microsoft's product activation servers, it is likely that the market would see an increase in pirated versions of the software. As a result, unsuspecting public consumers would undoubtably suffer some negative consequences.

Under both aspects of z4's proposed permanent injunction, there is a risk that certain sectors of the public might suffer some negative effects. However, the Court is unaware of any negative effects that might befall the public in the absence of an injunction. Although these negative effects are somewhat speculative, such potential negative effects on the public weigh, even if only slightly, against granting an injunction. Accordingly, the public interest is likely to be disserved if a per-manent injunction were entered against Microsoft.

## CONCLUSION

z4 has not demonstrated that it will suffer irreparable harm in the absence of a permanent injunction. Any harm z4 might suffer can be adequately remedied through the recovery of monetary damages. The balance of the hardships, although speculative, weighs in favor of Microsoft. And certain sectors of the public could suffer some negative effects if the Court were to grant z4's proposed permanent injunction. Accordingly, a permanent injunction should not issue, and z4's motion is **DENIED.**

In light of denying z4's proposed permanent injunction, an efficient method for z4's recovery of future monetary damages post-verdict is needed. The Court crafts such a remedy by severing z4's continuing causes of action for monetary damages due to Microsoft's continuing post-verdict infringement of z4's patents. Therefore, the Court **SEVERS** z4's causes of action for post-verdict infringement under cause number 6:06cv258 and **ORDERS** z4 to file an appropriate complaint within ten days of the issuance of this Memorandum Opinion and Order. The Court **ORDERS** Microsoft to file an answer to z4's complaint within the normal time allotted under the Federal Rules of Civil Procedure. Furthermore, the Court **ORDERS** Microsoft to file quarterly reports in the new action beginning on July 1, 2006 indicating the number of units sold with regard to all Microsoft products found to infringe z4's patents in this case. This will preserve z4's rights to future monetary damages in an efficient manner, while relieving Microsoft of the hardship and expense that would be occasioned by the issuance of a permanent injunction. This case will pro-

ceed on to entry of final judgment and whatever resolution may follow.